# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| KAY JOHNSON-KEYS, | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 1:15-CV-331 |
| BLUFFTON HEALTH SYSTEM, LLC, d/b/a Bluffton Regional Medical Center, | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court on Defendant Bluffton Health System, LLC, d/b/a Bluffton Regional Medical Center's Motion for Summary Judgment (ECF 35). Defendant seeks judgment as a matter of law on Plaintiff's claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and 42 U.S.C. § 1981. Plaintiff Kay Johnson-Keys filed a brief in opposition to the motion (ECF 46) and Bluffton Health filed a reply (ECF 48). For the reasons discussed below, Defendant's motion is **GRANTED**. The Clerk of the Court is instructed to enter judgment in favor of Defendant and against Plaintiff.

## FACTUAL BACKGROUND

### A. DR. KAY JOHNSON-KEYS

Plaintiff is a board-certified obstetrician and gynecologist. In 2006, Plaintiff entered into a three-year contract with Defendant to start an OB-GYN practice, Bluffton OB-GYN. This contract provided Plaintiff with a guaranteed yearly salary of $200,000 to provide forty hours of clinical, administrative, and operating room duties per week. In 2009, Plaintiff entered into a new five-year contract with Defendant that raised her base salary to $235,000, provided a retention bonus of $10,000, and included incentive provisions which provided for the possibility

of additional compensation if Plaintiff had a certain number of patient encounters.

In 2010, Plaintiff went on a waiting list for a kidney transplant due to deteriorating kidney function. Plaintiff began dialysis treatment in January of 2013, which required that she undergo several in-home treatments per day. Defendant accommodated Plaintiff's need for this treatment by allowing Plaintiff to take an additional hour break during her workday, although Plaintiff did not always utilize this accommodation. Plaintiff underwent a kidney transplant in November 2013, returning to office duties on February 17, 2014, and to hospital and on call duties on March 3, 2014. Even though Plaintiff's Family and Medical Leave Act ("FMLA") leave expired prior to her return, Defendant extended her leave until her return to full duty.

**B.      BOWERS, PATTERSON AND CLARK**

In mid-2012, Defendant hired additional staffing for Bluffton OB-GYN. Gail Clark (a nurse midwife) was hired on June 3, 2012, followed by Dr. Judith Bowers and Susan Patterson (also a nurse midwife) on August 13, 2012.

The relationship between Plaintiff, Bowers, Patterson, and Clark was not amicable. Indeed, at some point between August 13, 2012, and July 31, 2013, the office space at Bluffton was physically split to limit the interaction between the individuals; Plaintiff occupied one half of the office, while Bowers, Patterson, and Clark occupied the other. Following the split, Plaintiff was given all the staff necessary to operate as a solo practicing OB-GYN.

On August 9, 2013, Plaintiff filed a complaint with Defendant's human resources department accusing Bowers, Patterson, and Clark of harassment. Specifically, Plaintiff alleged that Bowers, Patterson, and Clark "repeatedly humiliated me at staff meetings and expressed a deep [rage] against working with me in the office that goes far beyond what would be expected as a reaction to clinical differences in patient care." Plaintiff's Dep. (ECF 36-2), p. 141, ll. 6-10.

However, Plaintiff admitted in her deposition that she has no evidence that the animus between the four individuals was motivated either by Plaintiff's race (Plaintiff is black) or Plaintiff's medical condition. *Id.*, p. 149, ll. 13-20. Following an investigation, Patricia Sprinkle, Defendant's Vice President of Human Resources, concluded that the incidents alleged in Plaintiff's August 9, 2013, complaint were not racially motivated.

**C.     CONTRACT NEGOTIATIONS**

In 2012, negotiations began between Plaintiff and Defendant on a contract to take effect following the expiration of the contract executed in 2009.[1] Plaintiff's notes reflect that, in August 2012, she requested a five-year contract with a guaranteed salary of $250,000, with all other provisions to be substantively the same as the 2009 contract. Plaintiff again extended this request in February of 2013. As negotiations extended into November and December 2013, Plaintiff dropped her requested guaranteed salary to $150,000, plus an additional $100,000 for midwives, in exchange for a 32-hour work week.

Defendant provided its first written proposal to Plaintiff on February 26, 2014. Defendant offered a three-year contract, with a base salary of $235,000 for the first year, a base salary of $117,500 for the second year along with a productivity component, with the third year's compensation based entirely on productivity. Plaintiff would additionally receive $12,000 per year for midwives supervision.

Plaintiff communicated her counter-offer on April 9, 2014. In that counter-offer, Plaintiff demanded a five-year contract with a guaranteed salary of $150,000 each year; $14,500 per year to cover satellite offices; $18,000 per year to supervise midwives; a bonus based on productivity;

---

[1] The 2009 contract would be amended twice during the negotiations to extend the expiration date, first to March 31, 2014, and then to June 30, 2014.

and a 32-hour work week. According to Defendant, it agreed on June 10, 2014, to the 32-hour work week. Plaintiff denies that she was ever told this information, and instead claims that she was told that Defendant's corporate parent did not permit a 32-hour work week.

Defendant's last verbal offer was made in June of 2014, and again featured a contract that began with a guaranteed salary and moved to productivity compensation. This offer was rejected by Plaintiff. At this time, Defendant decided to walk away from the negotiations, believing that the parties were too far apart. Plaintiff made one last offer later in June 2014, now offering to work for a guaranteed salary of $50,000 per year and a 32-hour work week. This offer was rejected, and Plaintiff was informed on June 27, 2014, that her employment with Defendant would cease when her contract expired on June 30, 2014.

## DISCUSSION

**A.     SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). "[Speculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

As the Seventh Circuit has explained many times and reiterated recently, a district court's task on summary judgment is as follows:

> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true. As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

To survive summary judgment, the non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

### B.     PLAINTIFF'S TITLE VII AND § 1981 CLAIMS

Title VII of the Civil Rights Act of 1964 makes it illegal for any employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or

classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a). 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Although § 1981 and Title VII proscribe different types of discrimination, "the methods of proof and elements of the case are essentially identical." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996).

Discrimination claims may be reviewed on summary judgment under the direct or burden-shifting methodologies. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a court should assess the case in those terms. *David*, 846 F.3d at 224; *see also Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that the *McDonnell Douglas* burden shifting analysis was not displaced by *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760 (7th Cir. 2016)). When the plaintiff does not present his argument in opposition to summary judgment in those terms, the direct method of proof is the "default rule." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013)). Under that method, the test for whether a claim of discrimination should proceed to a jury is whether the admissible

7

evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's membership in a protected class caused the adverse action. See *Ortiz*, 834 F.3d at 765 (setting out the standard for avoiding summary judgment on a discrimination claim under the direct method of proof). In all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224 (citing *Morgan*, 724 F.3d at 997); see also *Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination."). In her response in opposition to Defendant's motion, Plaintiff colorfully invites the Court to employ the analysis set forth in *Ortiz*. Plaintiff's Response (ECF 46), p. 14.[2] Accordingly, to defeat summary judgment Plaintiff must present evidence that would permit a reasonable jury to find that Defendant took adverse action against her because of her race. *Ortiz*, 834 F.3d at 765.

Comparing Plaintiff's Complaint to her response brief, it appears that her racial discrimination claims have evolved considerably over the intervening three and a half years

---

[2] Plaintiff states that "in *Ortiz* . . . , the Seventh Circuit metaphorically unleashed a judicial attack of Agent Orange against what it described as the 'legal kudzu' generated by the so-called 'convincing mosaic' metaphor, and the resulting attempts to distinguish between 'direct' and 'circumstantial' evidence." Plaintiff's Response, p. 14 (quoting *Ortiz*, 834 F.3d at 765). Plaintiff asserts that "[t]he legal standard, Judge Easterbrook made clear, is '***simply whether the evidence would permit a reasonable fact-finder to conclude that [the Plaintiff's] race, ethnicity, sex, religion, or other proscribed factor caused the [adverse action the Plaintiff claims].***'" *Id.* (emphasis in original). Plaintiff's statement regarding the standard set forth in *Ortiz* is correct, but she fails to meet it because she fails to muster any evidence showing that her race or her disability were the cause of the adverse employment actions she suffered.

since this case was filed. In her Complaint, Plaintiff's claims under Title VII and § 1981 center entirely around her allegation that Defendant refused to permit a reduction in her work week from forty hours to thirty-two hours. Complaint (ECF 1), pp. 4-5. In her response to Defendant's motion for summary judgment, however, Plaintiff directs the Court to her alleged treatment by Bowers, Patterson, and Clark, and the resulting separation of the Bluffton OB-GYN practice. Plaintiff's Response, pp. 15-18. Because this is the evidence that Plaintiff has marshaled and presented, the Court will evaluate her Title VII and § 1981 claims under this factual framework.

As a threshold matter, the parties dispute whether the hiring of Bowers, Patterson, and Clark, and the subsequent separation of the practice, constitutes an adverse employment action. An employer's action is "materially adverse" if it is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013) (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009)). But, a change in pay and benefits is not a prerequisite for establishing that an employer engaged in a materially adverse action. *See Nagle*, 554 F.3d at 1119-20. Examples of qualifying actions include: (1) reductions in compensation, fringe benefits, or other financial terms of employment, including termination; (2) preventing an employee from using the skills she developed and in which she is trained, such that those skills atrophy and her long-term career prospects are reduced; or (3) changing an employee's work conditions "in a way that subjects h[er] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in h[er] workplace environment." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (quoting *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002)).

Based on the designated evidence, the Court finds that a reasonable jury could conclude that Plaintiff suffered an adverse employment action. Following the hiring of the additional

providers into the practice, Plaintiff "has competition where she didn't before." Garofola Dep. (ECF 36-3), p. 50, ll. 13-14.[3] Since Plaintiff's compensation under the 2009 contract was based, at least in part, on the number of patient encounters, this additional competition had the potential to result in a direct reduction in the financial terms of Plaintiff's employment. *See, e.g., Walls v. Turano Baking Co.*, 221 F.Supp.2d 924, 932 (N.D. Ill. 2002) (finding that re-assignment to a sales route resulting in loss of commissions constituted a materially adverse employment action). In addition, Plaintiff's designated evidence could lead a reasonable jury to conclude that Plaintiff suffered a significantly negative alteration in her workplace environment. Plaintiff states that Bowers, Patterson and Clark "pushed [her] around the office," referred to Plaintiff's practice as the "bad side" in front of patients and staff, treated her with a "caustic demeanor," and spoke to her in "harsh tones." Plaintiff's Dep. (ECF 36-2), pp. 44, 76, 94, 95. Patterson and Clark, who occupied an inferior professional position to Plaintiff, refused to work with Plaintiff and bypassed Plaintiff on matters of patient care. *Id*., pp. 96-97, 99, 101-102, 146.[4] Taken as a whole, these allegations could lead a reasonable jury to conclude that a material adverse employment action had been taken. But that is not the end of the inquiry, since material adverse employment actions are not, in and of themselves, actionable under Title VII or § 1981. Instead, a plaintiff can only prevail where the adverse employment action was the result of her membership in a protected class. *Ortiz*, 834 F.3d at 765. It is on this basis that Plaintiff's claims must fail.

---

[3] Aaron Garofola was the CEO of Bluffton Health.

[4] The Court notes that the allegations against Bowers, Patterson, and Clark are typical of hostile work environment claims, a claim that Plaintiff does not present. *See, e.g., Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019).

Plaintiff admits that "she never heard any overt racial epithets or remarks and was never subjected to explicitly racial harassment." Plaintiff's Response, p. 18. Instead, Plaintiff asserts that the "most significant" evidence in support of her claim of discrimination is "that she ***experienced*** the treatment she received as being racially motivated." *Id*. (emphasis in original). According to Plaintiff:

> No white person can understand the subtle indices of racism that black Americans have experienced. Similarly, no white person can perceive those seemingly-slight, but significantly hurtful signals in the same way a black person can.

*Id*. Stated another way, "certain actions, words, or signs may take on meaning within a particular culture as a result of the collective use of those actions, words, or signs to represent or express shared but repressed attitudes," including attitudes concerning race. Terry Smith, Everyday Indignities: Race, Retaliation, and the Promise of Title VII, 34 Colum. Hum. Rts. L. Rev. 529, 537 (2003), quoting Charles R. Lawrence III, The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism, 39 Stan. L. Rev. 317, 322 (1987). Viewed through this lens, Plaintiff asserts that nominally innocuous actions had a discriminatory effect.

The Court does not discount these so-called "microaggressions." However, it is not necessary to determine whether they could substantiate a claim under Title VII or § 1981. That is because the aggressions identified by Plaintiff are not "micro" in any sense. Rather, to use Plaintiff's term, they were "palpable." The alleged actions in this case, boorish workplace behavior and insubordination, are not subtle nor unique to African Americans. They are capable of being understood and perceived by individuals of all races and creeds who have ever worked in an office environment with other human beings. The actions complained of here do not fall under the guise of microaggressions, and Plaintiff cannot escape the requirement of evidence by claiming that they do.

"Federal law provides that an employee is to be free from racial discrimination in the workplace, which includes freedom from a racially-hostile work environment. It does not guarantee a utopian workplace, or even a pleasant one. If the workplace is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated. In short, personality conflicts between employees are not the business of the federal courts." *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). So it is here. Plaintiff has failed to muster and present evidence demonstrating that any of the actions taken by, or relating to, Bowers, Patterson, and Clark were motivated by racial animus or any other prohibited basis. Plaintiff provides plenty of evidence of dysfunction in the office after Clark, Bowers and Patterson joined the practice, but no evidence that the dysfunction stemmed from racial animus. Johnson-Keys claims she "was attacked, in ways that *she perceived to be racial*, by Bowers, Patterson, and Clark[.]" Plaintiff's Response, p. 5 (italics added). Johnson-Keys' subjective beliefs would be directly relevant if she were pursuing a hostile work environment claim, since such claims specifically require evidence of conduct that is "severe or pervasive from both a subjective and an objective point of view." *Equal Employment Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). But as the Court noted above, Johnson-Keys has not alleged a hostile work environment claim in this lawsuit. In the end, Johnson-Keys' assertions that she "*experienced* the treatment she received as being racially motivated[]" and that she "was attacked, in ways that she *perceived* to be racial[,]" (Plaintiff's Response, pp. 5 and 18) do not constitute evidence from which "a reasonable trier of fact could infer retaliation or discrimination." *Liu v. Cook Cty.*, 817 F.3d at 315. Accordingly, Defendant's motion for summary judgment on Plaintiffs Title VII and § 1981 claims will be granted.

C.  **PLAINTIFF'S ADA CLAIMS**

The ADA prohibits employers from discriminating against a "qualified individual" on the basis of his disability. 42 U.S.C. § 12112(a). To prove a claim of disability discrimination, the Plaintiff "must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (citing *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)). The language of the ADA requires proof of "but for" causation. *See A.H. by Holzmueller v. Ill. High Sch. Assoc.*, 881 F.3d 587, 593 (7th Cir. 2018). To defeat summary judgment, the plaintiff must adduce evidence that, when considered as a whole, would permit a reasonable jury to find that Defendant took adverse action against her because of her disability. *See Monroe*, 871 F.3d at 504.

For the sake of efficiency, and because the Court's review of the record reveals triable issues of fact regarding whether Plaintiff was disabled and was qualified to perform the essential functions of the job with or without reasonable accommodation during portions of the relevant periods, the Court will not include a discussion of the first two elements. Plaintiff's claim would survive summary judgment if those were the only two elements of her disability discrimination claim. However, the pivotal question in this case is whether Defendant took adverse employment actions against Plaintiff on the basis of her disability. *See, e.g.*, *Guzman v. Brown Cty.*, 884 F.3d 633, 641 (7th Cir. 2018) (stating that it was not necessary to decide whether the plaintiff was a qualified individual with a disability because, even if she was, summary judgment was warranted because the evidence did not establish that an adverse employment action occurred as a result of that disability).

13

The adverse action identified by Plaintiff in support of her ADA discrimination claim is her assertion that Defendant refused, as part of the ongoing contract negotiations, to permit Plaintiff to work a 32-hour work week as an accommodation for her medical condition. The problem for Plaintiff is that there is no evidence in the record demonstrating the alleged refusal. While Plaintiff repeatedly cites to an alleged statement by Aaron Garofola that Defendant did not permit doctors to work a 32-hour work week, Plaintiff testified that Defendant agreed to seek an exception to this policy for Plaintiff. In Plaintiff's deposition, the following exchange occurred:

> A. Garofola] told me that CHS required all physician contracts to be 40 hours. And said to him, "Could they consider making an accommodation due to the Americans with Disabilities Act?" And he said, "They don't do that."
>
> Q. And is it possible that he said I will go back and check to see if we can do that?
>
> A. No.
>
> \*\*\*
>
> Q. Is it possible that he said that and not that they don't do that?
>
> A. He did not say that. Because I was the one after he said they don't do that that asked him to go back and check with them.
>
> Q. And did he say he would do that?
>
> A. Yes.

Plaintiff's Dep., pp. 187-88. Plaintiff later testified that Garofola never advised her whether he was able to secure approval for the 32-hour work week. *Id.*, p. 193, ll. 12-16. Therefore, at worst, Plaintiff's designated evidence shows that the issue of the 32-hour work week was an open question in the negotiations.

Defendant's designated evidence, on the other hand, answers that question. According to Defendant, Garofola sent a part-time or PRN worksheet to Defendant's corporate parent on June 10, 2014, which was a requirement anytime a request was made for a contract calling for less than a 40-hour work week. Garofola Dep., p. 92, ll. 10-19; Exhibit BB. Garofola testified that Defendant's corporate parent approved the request. *Id.*, p. 93, ll. 2-5. While Plaintiff denies that she was ever informed of this decision, she designates no evidence that disputes that the decision was made.

Rather than demonstrating discrimination, the record before the Court demonstrates that Defendant was exceedingly accommodating of Plaintiff's condition. Prior to Plaintiff's kidney transplant, she was allowed an extra hour each day to receive dialysis treatments. Plaintiff's Dep., p. 33, ll. 4-7. Defendant extended Plaintiff's leave beyond what was required by FMLA after Plaintiff's kidney transplant. Sprinkle Dep. (ECF 36-5), p. 52, ll. 1-7. Most notably, after Plaintiff's return from her leave it appears that she was permitted to work a 32-hour work week, Defendant's alleged 40-hour work week policy notwithstanding. Plaintiff's Dep., p. 179, l. 19, p. 180, l. 3. Therefore, there is no evidence in the record to support Plaintiff's claim of ADA discrimination, and summary judgment is appropriate.

For these same reasons, Plaintiff has not shown that any of the Defendant's actions were in retaliation for an accommodation for her medical condition. Surviving summary judgment on a disability-based retaliation claim requires showing (1) statutorily protected activity; (2) adverse employment action; and (3) causal connection between the two. *Guzman*, 884 F.3d at 642. Based upon the undisputed testimony before the Court, there can be no causal connection between Plaintiff's request for a 32-hour work week and the non-renewal of her contract because the parties agreed to that term.

Even if the Court were to find that Plaintiff could carry her initial burden on the retaliation claim, summary judgment would still be appropriate. If this initial burden is satisfied, "the burden then shifts to the defendant to present a non-invidious reason for the adverse employment action." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011). "If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual." *Id*. "[P]retext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Burton v. Bd. of Regents*, 851 F.3d 690, 698 (7th Cir. 2017) (quoting *Harden v. Marion Cty. Sheriff's Dep't.*, 799 F.3d 857, 864 (7th Cir. 2015)).

The Court concludes that Defendant has identified a "non-invidious" reason for its decision not to renew Plaintiff's contract: her insistence on a guaranteed salary. Plaintiff's insistence was "a deal breaker for her and it was a deal breaker for" Defendant. Lehn Dep. (ECF 36-4), p. 48, ll. 21-22.[5] Every step of the negotiations between the parties bears this out: Plaintiff repeatedly requested a contract with a fully guaranteed salary, and Defendant repeatedly offered a contract that transitioned from a guaranteed salary to a performance-based, non-guaranteed salary. While Plaintiff has identified several reasonable rationales for her insistence on some form of guaranteed salary (Plaintiff's Declaration, ¶¶8-10)[6], those rationales do not render

---

[5] Matthew Lehn "was chief operating officer [for Defendant] from October of 2013 to September of 2014." Lehn Dep., p. 7.

[6] Johnson-Keys submitted , as part of her Appendix and Designation of Evidence in opposition to Defendant's motion, a statement she titled "Declaration Under Oath of Dr. Kay Johnson-Keys." Plaintiff's Appendix (ECF 47-1). The declaration is not dated or signed by Plaintiff, but Defendant did not object or otherwise challenge the document and the Court considered it along with all the supporting evidence submitted by the parties. It is significant that in this declaration Johnson-Keys reiterates that her "insistence, in my contract negotiations, on a salary guarantee was motivated by concerns that bringing in three new providers at one time would lead to my own practice being

16

Defendant's requirement for productivity-based compensation either invidious or pretextual. As Bluffton Health states it: "This inability of the parties to come to mutually agreeable terms regarding the method of compensation, with both sides being unwilling to fully budge from incompatible demands, is a legitimate and non-discriminatory reason for Bluffton [Health] to not renew Dr. Johnson-Keys' contract." Defendant's Brief in Support, p. 15.

Plaintiff provides no evidence that Defendant's actions related to the non-renewal of her contract, taken alone or cumulatively, were either discriminatory or in retaliation for her request for accommodation under the ADA. And even if one were convinced that Defendant took some adverse action, Plaintiff cannot show that Defendant's explanation for non-renewal was pretext. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA claims.

In sum, Johnson-Keys has failed to muster sufficient evidence to create a triable issue as to her race claims or her ADA claims. The evidentiary record she submitted in opposition to the motion for summary judgment includes portions of her deposition testimony, portions of the deposition of testimony of Aaron Garofolo, and her "declaration." Plaintiff's Appendix and Designation of Evidence (ECF 47). The Court reviewed it carefully and considered the arguments presented by both sides in their briefs. Based on that record, Johnson-Keys fails to present sufficient evidence (any evidence, really) of race or disability discrimination. She also fails to present sufficient evidence to show that Bluffton Health's proffered explanations for its actions were pretextual. What the record shows is that a promising professional relationship between Johnson-Keys and Bluffton Health, which began in March of 2009, deteriorated over

---

'cannibalized,' which would mean a significant pay reduction if I was compensated based on productivity." Declaration of Johnson-Keys, pp. 1. This is the entire focus of the declaration, which does not include any mention, let alone any allegations, of race or disability discrimination.

time and ended on June 30, 2014, when the two sides could not agree to the terms of a renewed contract. That is a regrettable ending, but nothing Johnson-Keys has presented indicates that it was the result of racial animus or disability discrimination. "[I]f it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated." *Celotex*, 477 U.S. at 322; *Ziliak*, 324 F.3d at 520 (7th Cir. 2003). So it is here, where the Plaintiff has failed to present sufficient evidence to create a triable issue of fact as to any of her claims and the Defendant is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Motion for Summary Judgment (ECF 35). The Clerk is instructed to enter judgment in favor of Defendant and against Plaintiff.

Date: June 13, 2019.

      /s/ William C. Lee
William C. Lee, Judge
U.S. District Court
Northern District of Indiana